# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

FRUITS-GIDDINGS S.A.  DE C.V.; GIDDINGS
BERRIES CHILE S.A.; AND GIDDINGS
BERRIES PERÚ S.A.C.,

                        Plaintiffs,

      v.

ALWAYS FRESH FARMS, LLC; WAYNE
GIDDINGS; AND MATTHEW GIDDINGS

                  Defendants.

CASE NO.  8:20-cv-02875

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Fruits-Giddings S.A.  de C.V., Giddings Berries Chile S.A., and Giddings Berries Perú S.A.C.  (collectively herein, "Plaintiffs"), for their complaint against Defendants Always Fresh Farms, LLC, Wayne Giddings, and Matthew Giddings,[1] allege as follows:

## NATURE OF THE ACTION

1.      This is an action for damages caused by Defendant Always Fresh Farms, LLC's mishandling of hundreds of millions of dollars' worth of fruit that it was entrusted to sell on behalf of Plaintiffs, representing virtually all of Plaintiffs' supply of produce to the North American export market during their 2019-2020 season.

2.      Consumers in the United States enjoy year-round availability of fresh berries, including blueberries, blackberries, raspberries, and strawberries, because of a robust trade in

---

[1] There is no familial relationship between Plaintiffs and Messrs.  Giddings of Always Fresh Farms, LLC.

these commodities from Mexico and South America during the months when domestic production is low (the fall through early spring).  Foreign producers and suppliers sell their fruit in the United States directly to buyers, through the use of brokers, through "growers' agents" or other "commission merchants" as those terms are defined under the Perishable Agricultural Commodities Act and its regulations (the "PACA"), or through any combination of those methods.

3.      In this case, defendant Always Fresh Farms, LLC and its principals, Wayne and Matthew Giddings, induced Plaintiffs to supply their fruit on an exclusive basis to Always Fresh Farms, LLC as their sales agent with material misrepresentations about (among other things) their systems and operational capacity to handle Plaintiffs' volume of export fruit and their transparency in providing customer, sales, and other financial information.

4.      Once the season was underway, Plaintiffs were kept in the dark on material information that was fundamental to the parties' relationship.  With prices yielding tremendous losses to Plaintiffs, Matthew Giddings induced Plaintiffs to continue working with Always Fresh Farms, LLC with false promises that the company would absorb the difference between Fruits-Giddings, S.A. de C.V.'s returns and competitive grower prices in Mexico and would communicate openly with Fruits-Giddings, S.A. de C.V. "to make sure we are higher th[a]n the field."

5.      Always Fresh's mishandling of Plaintiffs' fruit, its related acts and omissions, its negligence, and its breach of the parties' agreements, constituted "unfair practices" PACA. Defendants also are liable to Plaintiffs under the Florida Deceptive and Unfair Trade Practices

-2-

Act ("FDUTPA"), which broadly prohibits unfair or deceptive acts or practices in the conduct of any trade or commerce.

6.     As a result of Defendants' actions in breach of their legal responsibilities to Plaintiffs, Plaintiffs have suffered damages exceeding $25,000,000, for which they are entitled to full recovery.

## THE PARTIES

7.     Plaintiff Fruits-Giddings S.A. de C.V. ("Giddings Mexico") is a Mexican corporation with its principal place of business located in Mexico.

8.     Plaintiff Giddings Berries Chile S.A. ("Giddings Chile") is a Chilean corporation with its principal place of business located in Chile.

9.     Plaintiff Giddings Berries Perú S.A.C. ("Giddings Peru") is a Peruvian corporation with its principal place of business located in Peru.

10.     Plaintiff Giddings Mexico, Giddings Chile, and Giddings Peru are related business entities that are part of a larger consortium known as "Grupo Giddings."

11.     Giddings Mexico supplies high-quality, conventional and organic fresh blueberries, strawberries, blackberries, and raspberries for the North American export market (United States and Canada) from Mexico.

12.     Giddings Chile and Giddings Peru supply high-quality, conventional and organic blueberries for the North American export market (United States and Canada) from Chile and Peru, respectively.

13.     Plaintiffs each supply their produce from a combination of farms they own and third-party farms with which they contract in their respective home countries.

14. Always Fresh Farms, LLC ("Always Fresh") is a Florida limited liability company with its principal place of business in Winter Haven, Florida. The members of Always Fresh, and Wayne Giddings and Matthew Giddings, are citizens of Florida.

15. At all times relevant hereto, Always Fresh has operated its business under a valid United States Department of Agriculture ("USDA") PACA License, which the USDA has identified as License No. 20010241. The principals listed on Always Fresh's PACA License are Matthew Giddings and Wayne Giddings.

16. At all times relevant hereto, Always Fresh was engaged in the business of receiving perishable agricultural commodities in interstate or foreign commerce for sale, on commission, for or on behalf of another and is therefore a "commission merchant" as defined in PACA. *See* 7 U.S.C. § 499a(b)(5).

17. At all times relevant hereto, Always Fresh was engaged in the business of purchasing and/or selling produce in wholesale or jobbing quantities and is therefore a "dealer" of produce as defined in PACA. *See* 7 U.S.C. § 499a(b)(6).

18. Wayne Giddings is a citizen of Florida and at all relevant times was Manager, President, and an owner of Always Fresh.

19. Matthew Giddings is a citizen of Florida and at all relevant times was Chief Operating Officer, Chief Commercial Officer, and an owner of Always Fresh.

## JURISDICTION AND VENUE

20. The Court has subject matter jurisdiction over this action under 7 U.S.C. § 499e(b)(2) and 28 U.S.C. § 1331.

21.     The Court has subject matter jurisdiction over this action under 28 U.S.C. §
1337 because PACA is an "Act of Congress regulating commerce" and several of Plaintiffs'
claims herein arise under 7 U.S.C. § 499e(b)(2), 7 U.S.C. § 499p, and 7 C.F.R. § 46 *et seq*.

22.     The Court also has subject matter jurisdiction over this action under 28 U.S.C.
§ 1332 because there is complete diversity of citizenship between the parties and the amount
in controversy exceeds $75,000, exclusive of any claims for the recovery of exemplary
damages, pre or post-judgment interest, costs, or attorneys' fees.

23.     The Court has supplemental jurisdiction over Plaintiffs' other claims pursuant
to 28 U.S.C. § 1367(a).

24.     The Court has personal jurisdiction as to Defendants, each of whom is a Florida
citizen whose acts and omissions giving rise to Plaintiffs' claims occurred within Florida.

25.     Venue in this district is proper under 28 U.S.C. § 1391(b) because a substantial
part of the acts or omissions giving rise to Plaintiffs' claims occurred in this district and a
substantial part of the property that is the subject of this action is or was situated within this
district.

## FACTUAL ALLEGATIONS

## I.     The Parties Discuss Legal Integration and a Marketing Arrangement

26.     Plaintiffs have historically marketed their fruit in the United States and Canada
through sales agents who are paid on commission.

27.     For many years before the 2019-2020 export season, which generally runs
between late August and late April, Plaintiffs contracted with another entity to market and sell
their fruit throughout the United States and Canada.

28.     Grupo Giddings began to explore opportunities to change its North American sales agent to one that would provide full transparency on information related to customers, sales, charges against, and handling of their fruit.  Grupo Giddings also sought to work with a sales agent that it could own an equity interest in, allowing Grupo Giddings to maximize the returns on its fruit, and approached Always Fresh about this subject in or about January 2019.

29.     Plaintiffs' representatives Jorge Salman and Francisco Alvariño traveled to Always Fresh's headquarters in Winter Haven, Florida and met with Wayne Giddings, Matthew Giddings, and Keith Mixon in January 2019 to begin discussing a commercial relationship between Plaintiffs and Always Fresh.  Messrs.  Giddings represented in this meeting that Always Fresh was fully capable of handling, marketing, and selling Plaintiffs' entire supply of fruit for the North America export market at competitive prices.  They represented that Always Fresh had been growing exponentially in recent years and that its current customers and prospective customers with whom Messrs.  Giddings had high-level contacts had a large demand for Plaintiffs' products that Always Fresh was not yet meeting because of a lack of sufficient volume, explaining that they spent 70 percent of their time trying to procure fruit.  As discussed in the meeting, Plaintiffs' sourcing of fruit from many growers, including over a thousand growers with whom Giddings Mexico had a relationshp, would allow Always Fresh access to a large volume of fruit to market without needing to contract and manage relationships and logistics with thousands of individual growers.

30.     Always Fresh prepared a Memorandum dated January 30, 2019, titled "Re: Grupo Giddings and Always Fresh Farms, LLC" (hereafter, "January Memorandum") regarding its discussions with Grupo Giddings to that point.  The Memorandum began: "The

purpose of this memorandum is to outline a proposed model of an alliance between Grupo Giddings and Always Fresh Farms for the marketing in North America (the United States and Canada) of Grupo Giddings western hemisphere produced blueberries, blackberries, raspberries and strawberries."

31.     The January Memorandum summarized Grupo Giddings' "stated objectives" as including, among other things: "Complete transaction and supply chain transparency" and "[d]efined operational procedures and cost transparency."

32.     The January Memorandum also summarized Always Fresh's "stated objectives" as including transaction and supply chain transparency and defined operational procedures and cost transparency, as well as exclusivity with respect to Plaintiffs' fruit for the North American export market.

33.     The January Memorandum provided a framework for Grupo Giddings to become a co-owner of Always Fresh, but with Plaintiffs and Always Fresh nonetheless operating independently as supplier and commission merchant.

34.     Grupo Giddings and Always Fresh paused their discussions while Grupo Giddings considered other opportunities.  They resumed their discussions in June 2019.

35.     On June 21, 2019, Keith Mixon of Always Fresh, copying Wayne and Matthew Giddings, wrote to principals of Grupo Giddings suggesting that they use the January Memorandum as a starting point for further discussion and asked Grupo Giddings to "re-review the memorandum and give us some feedback as to what works and what doesn't."

36.     On July 3, 2019, Mr. Alvariño wrote to Mr. Mixon, Wayne Giddings, and Matthew Giddings that Grupo Giddings decided to "seriously evaluate and validate the

distribution of Giddings in North America with Always Fresh (AF) and Keith Mixon as CEO." He proposed a meeting to resolve details, writing: "it is imperative to develop the start [sic] business plan (temp 19/20) of the new company considering a likely scenario with 50% of the GF volume.  That also will allow AF to be prepared for the 2020-2021 season."

37.     Grupo Giddings inquired about Always Fresh's qualifications, focusing on its experience selling different fruit varieties and volumes, customers, packing formats, pricing, cost chain, logistics, and other suppliers.

38.     Defendants touted Always Fresh's existing customers and relationships, operational capabilities, low costs and ability to obtain strong prices, assuring Grupo Giddings that Always Fresh would be able to market 100% of Plaintiffs' fruit beginning immediately with the 2019-2020 export season as opposed to Giddings' proposal for 50 percent of Plaintiffs' fruit.

39.     Defendants represented that Always Fresh's enterprise resource planning software, Famous, would provide Plaintiffs' desired level of transparency on pricing, sales, and related information, and that they would provide this information to Plaintiffs.

40.     The parties, including Messrs. Giddings, arranged a meeting in Winter Haven, Florida, on or about July 18 and 19, 2019.  Shortly in advance of that meeting, Defendants shared with Grupo Giddings a presentation titled "Always Fresh Farms Overview and Amalgamated Business Financial Outlook" ("AFF Presentation").

41.     Defendants, including Messrs. Giddings, used the AFF Presentation to promote Always Fresh's customer base, record of exponential growth in recent years, and history of: "Accurate and timely information, constant communication;" "Creation of distribution

channels to maximize fresh deliveries, increasing consumption;" and "Executing logistics and supply chain."  Defendants presented Always Fresh as a "[s]pecialist berry grower and supply chain company with activity and therefore knowledge of every step in the supply chain," promoted its size and power, and listed as a key strength "[i]nvestment in the supply chain to enhance freshness and service."

42.     Defendants also represented in the AFF Presentation and their July 2019 meetings with Plaintiffs' representatives that (1) Always Fresh uses a "[d]emand forecasting tool that allow[s] for detailed weekly view by customer and commodity type" and that this resource would be leveraged to Plaintiffs' advantage; (2) Always Fresh's experience in the berry business, including that the experience of Wayne Giddings, Matthew Giddings, and Keith Mixon, was "unrivaled;" and (3) that Always Fresh uses a "Sales Strategy Driven by Demand."

43.     In presenting their Sales Strategy Driven by Demand, Defendants represented averages of forecasted weekly demand for blackberries, blueberries, and raspberries in various pack sizes for both current customers and prospective customers that were consistent with Plaintiffs' supply of fruit.

44.     Upon information and belief, Always Fresh had never marketed or sold fruit in the volumes Defendants represented they could handle based on customer demand, Always Fresh was incapable of handling such high volumes of fruit, and Defendants knew this when they represented Always Fresh was prepared to handle Plaintiffs' entire production of fruit.

EAST\177764640.1

45.     The parties' principals signed a document titled "**Always Fresh – Giddings PARTNERSHIP Matters for consideration**" (hereafter referred to as, "Transaction Term Sheet"), which was fully executed by early August 2019.

46.     The Transaction Term Sheet reflects its signers' agreement to enter into contracts effective in January 2020.  In particular:

a.   One or more contracts whereby Grupo Giddings would "acquire shares in AF" through "its Florida entity – with attempt to rename this company 'Giddings Always Fresh LLC;'"

b.   One or more contracts governing the activities and affairs of Always Fresh, including matters such as membership, capital contributions and dividends, company management, business planning and budgeting, transfer of ownership units, and restrictions on competition; and

c.   One or more contracts governing branding, sales commissions, costs, competitivity benchmarking, sales liquidations and payments, marketing expenditures, and supply strategy.

47.     Under the Transaction Term Sheet, Grupo Giddings would "receive a rebate of 0.6% on all sales revenues of AF for the period 1st September 2019 until 31st December 2019."

48.     The Transaction Term Sheet is prefaced with the following statement: "Post Winter Haven July 19 meeting, the following table updates the principle agreements between AF and GF in preparation for lawyers to draft an agreement."  The preface also notes that certain terms in the table were "not yet agreed."

49.     The parties promoted their agreement to work together internally within their organizations and in industry press.  Full transparency on customers, sales, prices, and related information on Always Fresh's part was a material aspect of the parties' discussions and was featured in announcements of the new relationship.

50.     Defendants induced Plaintiffs to select Always Fresh as their North American sales agent with representations that, among other things:

a.   Always Fresh possessed the skill, knowledge, expertise, and processes to handle and sell Plaintiffs' entire supply of fruit for the North American market at competitive prices;

b.   Always Fresh was committed to and would adhere to transaction and supply chain transparency, defined operational procedures, and cost transparency;

c.   Always Fresh's Famous software would provide Plaintiffs' desired level of transparency on pricing, sales, and related information;

d.   Always Fresh provides its growers "[a]ccurate and timely information, constant communication;"

e.   Always Fresh had created "distribution channels to maximize fresh deliveries, increasing consumption;"

f.   Always Fresh excelled in "[e]xecuting logistics and supply chain;"

g.   Always Fresh was a "supply chain company with activity and therefore knowledge of every step in the supply chain," that had "[i]nvest[ed] in the supply chain to enhance freshness and service;"

h.  Always Fresh used a "[d]emand forecasting tool that allow (sic) for detailed weekly view by customer and commodity type;" and

i.  Always Fresh's represented that based on its experience in the berry business, including the "unrivaled" experience of Wayne Giddings, Matthew Giddings, and Keith Mixon, Always Fresh had the wherewithal to handle and sell 100% of Plaintiffs' fruit at competitive prices.

51.  With respect to the fast-approaching 2019-2020 season, Plaintiffs immediately focused on how the parties would coordinate and share information.  They proposed hiring an experienced industry professional, Ian Grigg, to oversee logistics of importing fruit to the United States, communication between the parties, and to be immersed in the sales and operations activity of Always Fresh with respect to Plaintiffs' fruit.  Mr. Grigg had experience with Plaintiffs and their product from a role at their prior North American marketing firm.

52.  On August 20, 2019, Plaintiffs shared with Defendants a draft job description for Mr. Grigg and a draft presentation on how they saw his role interacting with the parties, prompting a severe backlash from Defendants and insistence that the role was unnecessary because they were fully capable of handling the logistics and operational functions involved. As a result, Mr. Grigg was not hired at that time.  Specifically, Mr. Mixon wrote to Mr. Salman, copying Wayne and Matthew Giddings, that "we have a firestorm here in the USA over this" and "we are derailed over here" because Defendants had "[n]o need for an intermediary getting between AFF and 3 country coordinators" and "[n]o desire for an agent to be involved in daily operations of AFF." He added that Always Fresh insisted on having "complete control over the sales and distribution."

II.     **The Parties' Commercial Relationship During the 2019-2020 Export Season**

53.     Plaintiffs began shipping fruit to Always Fresh in August 2019.  No written contract or statement of terms was made for Always Fresh's handling of this fruit or any of the fruit that Plaintiffs continued to supply during the 2019-2020 export season.

54.     Always Fresh circulated drafts of two of the contracts named in the Transaction Term Sheet in September 2019, still with the intention that they become effective in January 2020 after various future restructuring actions occurred.  Little progress, however, was made in negotiating these drafts and they were never signed (nor were the restructuring actions recited in them ever taken).

55.     Giddings Mexico delivered to Always Fresh a total of 3,394,618 boxes (8,296,926 kilos) of blueberries, blackberries, raspberries, and strawberries between late August 2019 and April 2020.

56.     Giddings Chile delivered to Always Fresh a total of 1,040,667 boxes (3,386,487 kilos) of blueberries between late August 2019 and April 2020.

57.     Giddings Peru delivered to Always Fresh a total of 824,714 kilos of blueberries between late August 2019 and January 2020.

58.     Plaintiffs delivered fruit to Always Fresh during the 2019-2020 season on a consignment basis and Always Fresh charged a commission of 8% and deducted charges related to handling the fruit from the sales proceeds, which Always Fresh agreed to liquidate and pay to Plaintiffs within 30 days after the fruit's delivery to Always Fresh.

59.     Under PACA, consignment is not a sale.  It creates an agency relationship between the consignor and the consignee, where the produce continues to belong to the

consignor until the consignee sells it on the consignor's behalf.  After such sale, the proceeds of the sale belong to the consignor, with the consignee allowed only to retain expenses of the resale and commission.

60.     Each shipment from Plaintiffs to Always Fresh also was subject to the terms on which Plaintiffs supplied the fruit, as evidenced by the export/import documentation, and by the laws applicable to the parties' commercial relationship, including PACA.

**III.     Always Fresh's Deficient Performance**

61.     Starting early in the 2019-2020 export season, Always Fresh's performance was deficient, including with regard to its handling, sales, and accounting for Plaintiffs' fruit.

62.     Plaintiffs were alerted to problems with Always Fresh's handling and sale of their fruit primarily through the liquidation statements and payments they received one month or longer after the fruit was delivered to Always Fresh.  Always Fresh did not provide detailed information about its sales, prices, or other commercial information in addition to its summary liquidation statements, despite its representations that it would do so.

63.     Liquidation statements are documents that sales agents in the produce industry use to account for their sales.  In a consignment relationship, sales agents are required under PACA to "truly and correctly account" for their sales "by rendering a true and correct statement showing the date of receipt and date of final sale, the quantities sold at each price, or other disposition of the produce, and the proper, usual or specifically agreed upon selling charges and expenses properly incurred or agreed to in the handling thereof, plus any other information required by § 46.29." 7 C.F.R.  § 46.2(y)(1).

64.     In addition to these deficiencies in performance early in the export season, the prices that Always Fresh reported to Plaintiffs and net returns plummeted for Giddings Mexico and Giddings Chile beginning in early October 2019 and throughout the rest of their season, and were at their worst for Giddings Peru between mid-November 2019 and the end of its program in January 2020.  Plaintiffs analyzed their returns throughout the season, taking particular note of the issues after multiple weeks of unexplained, low returns.

65.     Compared to average prices reported by the USDA's Agricultural Marketing Service in its Market News publication, Giddings Chile found that its returns fell hundreds of thousands of dollars short of reported industry "average" prices for the same commodities on a weekly basis, and as much as $892,808 below in a single week.

66.     Giddings Peru found that its returns were as much as $525,217 below the USDA's published "average" prices in a single week.

67.     While the prices Always Fresh liquidated and paid to Giddings Mexico were also dramatically below the USDA's Market News averages, they were especially low when compared to the prices Giddings Mexico paid to its growers that were needed to retain those vital relationships.

68.     The parties discussed the importance of benchmarking Giddings Mexico's returns against the prices that others in the industry pay growers for their fruit to make sure that Giddings Mexico did not lose money by buying fruit for a higher price than what it received from Always Fresh after resale.  The parties referred to this as "competitivity benchmarking" and agreed on it before Plaintiffs began shipping fruit to Always Fresh.  They accounted for it in the Transaction Term Sheet by agreeing to "[b]ench mark Mexico liquidated

returns for competitivity.  GF to highlight to AF if/when concerns occur.  Where unremedied in commercial settlement, issue to be discussed at board level with potential temporary margin subsidisation."

69.    Benchmarking returns to competitive prices was of vital importance for Giddings Mexico because it was required to pay the growers it sourced fruit from upon or within eight days after their deliveries, which was before Giddings Mexico would know the prices at which Always Fresh sold that fruit and before Giddings Mexico received the net returns.  Defendants understood that Giddings Mexico must pay competitive prices to its growers up front in order to secure their fruit and that Always Fresh needed that fruit to be able to obtain and keep its customer relationships.   The parties' agreement on competitivity benchmarking served all of the parties' interests.

70.    In mid-November 2019, Matthew Giddings requested that Mr. Salman relocate to Always Fresh's Florida headquarters for an extended period to improve the parties' working relationship.

71.    Mr. Salman sent an email to Matthew Giddings on November 14, 2019, with a proposed plan for his time in Florida covering a range of topics including commercial issues, supply chain, financial matters, corporate management and marketing.  Among the commercial issues, Mr. Salman requested access to online daily sales reports containing information about pricing, quantities, and customers, weekly management reports summarizing price projections and volumes, and benchmarking information to evaluate how Always Fresh's sales compared to the competition.  Plaintiffs made similar requests for information throughout the 2019-2020 season.

72.     Although Mr. Salman spent approximately two months with Always Fresh in Florida, he was not given access to any detailed sales, inventory, pricing, or customer information.  Wayne Giddings explained to Mr. Salman that this information was being withheld because Wayne Giddings thought Grupo Giddings would not want to move forward with the legal integration contemplated by the parties if it received the information.

73.     Plaintiffs analyzed the divergence between their returns and USDA average prices and competitive prices and presented their analysis to Always Fresh on multiple occasions, seeking an explanation and solutions.  Attending to these issues made the anticipated legal integration of the parties impossible and was made worse by Defendants' refusal to share information.

74.     On November 27, 2019, Julio Giddings, the founder of Grupo Giddings, sent an email to Matthew Giddings expressing his great concern about the low prices at which Giddings Mexico's fruit was sold by AFF and the utter lack of information from Always Fresh to explain the prices.  He explained that Giddings Mexico with only 10% of its total volume exported had already accumulated losses of nearly $400,000 as a result of the prices it had to pay its independent growers/farmers to obtain fruit at competitive prices.  He also requested detailed information about sales, inventories, prices, rejections, and customers and asked that Always Fresh confirm whether it had the capacity to sell Plaintiffs' fruit so that Giddings Mexico could consider alternative distribution channels if necessary.

75.     Matthew Giddings replied on November 27, 2019: "I understand your concern completely and am putting more pressure to get this corrected then (sic) you can imagine, we as well do not like representing returns lower then (sic) the market… **We will start absorbing**

**the difference to reflect competitive field prices, I will as well keep an open line in Mexico to make sure we are higher then** (sic) **the field.**"  (Emphasis added.)

76.     Giddings Mexico agreed to continue working exclusively with Always Fresh as its sales agent for the North American export market based on Always Fresh's promise, but the situation only worsened.  The gap between the sales prices AFF was able to obtain for Giddings Mexico fruit and the payments Giddings Mexico was required to make to its independent growers/farmers in order to remain competitive widened by more than $6,000,000 in subsequent weeks, with weekly gaps exceeding $1,000,000.

77.     These gaps persisted in spite of Always Fresh's request in mid-December 2019 that approximately one-third of Giddings Mexico's fruit be diverted to another marketing agency to allow Always Fresh to clear its backed up inventory and reduce volume going forward, which Giddings Mexico agreed to do.

78.     Always Fresh provided Mr. Salman with an aged inventory report on December 27, 2019, revealing that it had tens of thousands of boxes of Plaintiffs' fruit in inventory long after it should have been sold, including tens of thousands of boxes of fruit kept longer than 10 days after Always Fresh received them, tens of thousands more kept more than 20 days, and some kept as long as 31 days without being sold.

79.     Fruit of the varieties Plaintiffs supplied to Always Fresh is highly perishable and should be sold within 5 days after arrival to obtain its best price and avoid customer rejections and other losses due to deteriorating condition.

80.     Always Fresh's inability to properly handle and promptly sell Plaintiffs' fruit resulted in Always Fresh dumping or otherwise discarding Plaintiffs' fruit throughout the

2019-2020 season that had commercial value and could have been sold.  It also resulted in Always Fresh selling the fruit to commission merchants, brokers, terminal market customers, and others on terms that did not generate reasonable prices.

81.     Conceding that their operational resources were insufficient to handle Plaintiffs' volume of produce, Defendants requested that Grupo Giddings move forward with hiring Ian Grigg.  Grupo Giddings did so and Mr. Grigg began supporting the parties on or about January 1, 2020.  Although working for Grupo Giddings, Mr. Grigg was given an office at Always Fresh's headquarters, an Always Fresh email account, and placed in a management position over Always Fresh's operations staff.

82.     Mr. Grigg's access to Always Fresh's computer systems containing detailed information on inventories, sales, customers, and other financial information was limited in the initial weeks of his engagement, by which time Giddings Chile and Giddings Peru had finished their shipments for the export season.  Giddings Mexico still lacked the transparency it desired and had been promised.

83.     Always Fresh's inventory reports consistently showed fruit in storage for dozens of days and beyond one month throughout January 2020.

84.     Always Fresh did not begin to regularly provide inventory and sales reports to Plaintiffs until February 2020.  Matthew Giddings previously had instructed Always Fresh's Accounts Receivable Coordinator, who circulated inventory reports within the company, not to send them to Plaintiffs.

-19-

85.     While Always Fresh's inventory backlogs improved with Mr. Grigg's assistance, and the diversion of fruit to another marketing firm, the issue persisted throughout the rest of the season and Plaintiffs were still denied detailed pricing and customer data.

86.     Always Fresh's inability to promptly sell Plaintiffs' fruit at reasonable prices was caused by numerous operational deficiencies that were concealed from Plaintiffs until Mr. Grigg was engaged to attempt to correct them, and which stand in stark contrast with Always Fresh's representations before Plaintiffs agreed to supply their fruit.  These include, but are not limited to:

   a.   Deficient practices and procedures for giving packing guidance to Plaintiffs (e.g., asking Plaintiffs to pack fruit in various sized containers based on a percentage of Plaintiffs' available supply rather than based on Always Fresh's expected customer orders);

   b.   Deficient practices and procedures for communicating sales forecasts and pricing to Plaintiffs, including misrepresentation of market conditions by Matthew Giddings in hopes of decreasing the volume of Plaintiffs' shipments while Always Fresh was unable to promptly sell Plaintiffs' fruit;

   c.   Deficient practices and procedures for receiving, grading, monitoring, and rotating fruit at and between its cold storage facilities;

   d.   Poor vetting and oversight of its cold storage facility relationships and their personnel;

   e.   Deficient practices and procedures for capturing and reporting information about Plaintiffs' fruit to storage facility personnel and operations and sales staff;

EAST\177764640.1

f.  Deficient practices and procedures for managing fruit based on its quality and condition, including reworking or repacking fruit when advisable to obtain reasonable prices;

g.  Deficient practices and procedures in customer order fulfillment;

h.  Deficient practices and procedures in processing customer claims and rejections; and

i.  Deficient practices and procedures to validate that any produce dumped, destroyed, or donated was of no commercial value or had Plaintiffs' permission to be disposed of.

87.  Always Fresh's deficient operations resulted in Defendants, among other things:

a.  Allowing Plaintiffs' produce to remain in inventory after delivery to Always Fresh's facilities for an unreasonably long time, often exceeding a month;

b.  Accepting Plaintiffs' produce with knowledge that Always Fresh's backup of inventory and deficient logistics, operations, and sales resources would not allow it to sell and deliver the produce within a reasonable period of time;

c.  Re-consigning Plaintiffs' produce to other commission merchants without required approvals from Plaintiffs;

d.  Unreasonably selling Plaintiffs' produce to wholesalers;

e.  Selling Plaintiffs' produce through auctions, brokers, and under promotions and deducting related fees from Plaintiffs' sales proceeds without necessary approvals from Plaintiffs;

f.   Neglecting shipments of fruit that Always Fresh considered inferior, unreasonably allowing it to go to waste or selling for unreasonable prices;

g.   Failing to require Always Fresh's customers to comply with the terms of their orders and PACA when claims or rejections against deliveries occurred;

h.   Unreasonably and without proper justification or Plaintiffs' approval, dumping, donating, or discarding Plaintiff's produce;

i.   Failing to timely render true and correct accountings to Plaintiffs of its dealings in Plaintiffs' fruit (instead issuing liquidation statements that improperly pooled or averaged sales and charges, often far later than liquidations were due); and

j.   Failing to timely pay the proceeds from the sale of Plaintiffs' fruit within 30 days of delivery of Plaintiffs' shipments to Always Fresh.

88.   Owing to Always Fresh's (a) deficient and poorly-resourced logistics, operations, and sales functions; (b) concealment of its performance issues and the reasons therefor from Plaintiffs, and (c) false representations and inducements to Plaintiffs, Plaintiffs received tens of millions of dollars less for their fruit in the 2019-2020 season than they received in comparable seasons.   Plaintiffs' brand, goodwill, and grower and financing relationships were and have been damaged.

89.   Always Fresh knowingly undertook to act for the benefit of Plaintiffs, as their agent, with numerous fiduciary obligations and duties imposed by law.   Defendants induced Plaintiffs to enter that relationship and forgo opportunities with other produce marketing firms based on false and materially misleading statements, and thereafter consciously and recklessly disregarded their obligations and duties to Plaintiffs' detriment.   Defendants then induced

Giddings Mexico to continue with the relationship longer by representing they would cover the difference between Always Fresh's prices and competitive prices in Mexico, which Defendants did not intend to do and ultimately refused to do.

90.     Defendants' misconduct has caused Plaintiffs to suffer substantial damages and justifies an award of punitive damages and the disgorgement to Plaintiffs of all commissions deducted from Plaintiffs' sales proceeds in amounts to be proven at the time of trial.

## COUNT I

### PACA Violation – 7 U.S.C.  § 499b(3)

### (Unfair Conduct (Dumping) – Defendant Always Fresh)

91.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

92.     It is unlawful under 7 U.S.C.  § 499b(3) "[f]or any commission merchant to discard, dump, or destroy without reasonable cause, any perishable agricultural commodity received by such commission merchant in interstate or foreign commerce."

93.     As a commission merchant, Always Fresh was required, in the event it dumped any produce received from Plaintiffs, to create and preserve a "clear and complete record…showing justification for dumping" on the basis that it "cannot be sold due to poor condition or is lost through re-sorting or reconditioning." In the event five percent or more of a shipment was dumped, Always Fresh was required to obtain "an official certificate, or other adequate evidence…to prove the produce was actually without commercial value, unless there [was] a specific agreement to the contrary between the parties." 7 C.F.R.  § 46.22; *see* 7 C.F.R.  § 46.23, 46.29.

94.     Always Fresh discarded, dumped, or destroyed produce consigned to it by Plaintiffs during their 2019-2020 export season without reasonable cause and without complying with Always Fresh's obligations under 7 C.F.R. §§ 46.22, 46.23, and 46.29.

95.     The parties did not make an agreement modifying or waiving Always Fresh's obligations under 7 C.F.R. § 46.22 or any other provision of PACA.

96.     Per 7 U.S.C. § 499e(a), "[i]f any commission merchant, dealer, or broker violates any provision of section 499b of this title he shall be liable to the person or persons injured thereby for the full amount of damages (including any handling fee paid by the injured person or persons under section 499f(a)(2) of this title) sustained in consequence of such violation."

97.     Plaintiffs have suffered damages as a result of Always Fresh's discarding, dumping, or destruction of Plaintiff's fruit in violation of PACA and accompanying regulations in an amount to be determined at trial.

## COUNT II

### PACA Violation – 7 U.S.C. § 499b(4)

### (Unfair Conduct (Fraudulent Statements) – Defendant Always Fresh)

98.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

99.     It is unlawful under 7 U.S.C. § 499b(4) "[f]or any commission merchant, dealer, or broker to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is

-24-

received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer…"

100.    Always Fresh, through its representatives, including Wayne and Matthew Giddings, made repeated false and misleading statements to Plaintiffs and their representatives to induce their agreement to retain Always Fresh as Plaintiffs' North American sales agent in the 2019-2020 season and to induce Giddings Mexico to continue its relationship with Always Fresh despite the deficit between Always Fresh's liquidated prices and Giddings Mexico's grower payments.

101.    Always Fresh's representatives knew these representations were false and materially misleading in the context they were made, for the purpose of inducing Plaintiffs to rely upon their truth and accuracy by supplying their fruit for the North American market and foregoing opportunities to work with and gain ownership interests in other North American marketing companies.

102.    As to representations about future performance, Always Fresh's representatives had no intention that the representations would be performed or met and knew that Always Fresh's limited resources precluded Always Fresh from performing or meeting them.

103.    Plaintiffs reasonably relied on Always Fresh's false and misleading statements to their detriment by supplying their fruit for the North American export market to Always Fresh and forgoing opportunities to work with and gain ownership interests in other North American marketing companies, and Giddings Mexico reasonably relied on Always Fresh's promise to absorb differences between Always Fresh's prices and competitive prices to

Mexican growers by continuing to supply Always Fresh with fruit for sale on its behalf even though it continued incurring such losses.

104.     Pursuant to 7 U.S.C.  § 499p, Always Fresh's representatives' false and misleading statements are deemed the acts of Always Fresh as the commission merchant or dealer who they represented.

105.     As a result of Always Fresh's fraudulent, false and misleading statements to Plaintiffs in connection with the marketing of their fruit in the North American market, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT III

### PACA Violation – 7 U.S.C.  § 499b(4)

### (Unfair Conduct (Breach of Duty) – Defendant Always Fresh)

106.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

107.     It is unlawful under 7 U.S.C.  § 499b(4) for any commission merchant or dealer "to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction."

108.     As a commission merchant accepting Plaintiffs' produce on consignment, Always Fresh was required to exercise reasonable care and diligence in selling Plaintiffs' fruit "promptly and in a fair and reasonable manner." 7 C.F.R.  § 46.29(a).

109.     Among Always Fresh's duties to Plaintiffs under PACA was the duty to act in "good faith," defined to mean "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." 7 C.F.R.  § 46.2(hh).

110.     Always Fresh failed to exercise reasonable care and diligence in selling Plaintiffs' fruit promptly and in a fair and reasonable manner and failed to act in good faith in its relationship with Plaintiffs.

111.     As a consignee under PACA, Always Fresh had a duty to keep Plaintiffs fully informed of developments in connection with transactions in Plaintiffs' fruit and of any inability to make a satisfactory disposition of goods.

112.     Always Fresh undertook a duty to be completely transparent with Plaintiffs regarding its sales of their produce during the 2019-2020 export season.

113.     Always Fresh breached its duty to inform Plaintiffs about the specifics of its handling of their produce and inability to make a satisfactory disposition of the fruit throughout the season.

114.     Always Fresh also expressly undertook and breached a duty to absorb the difference between its sales proceeds for Giddings Mexico and competitive grower prices Giddings Mexico paid for the fruit it supplied to Always Fresh.

115.     As a result of Always Fresh's failure to perform, without reasonable cause, its duties to Plaintiffs with respect to the marketing of their fruit in the North American market, Plaintiffs have suffered damages in an amount to be determined at trial.

<u>**COUNT IV**</u>

**PACA Violation – 7 U.S.C.  § 499b(4)**

**(Unfair Conduct (Failure to Account and Promptly Pay) – Defendant Always Fresh)**

116.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

-27-

117.     It is unlawful under 7 U.S.C. § 499b(4) for any commission merchant or dealer "to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had."

118.     Always Fresh was required to prepare and maintain complete records on all its transactions in Plaintiffs' fruit in sufficient detail as to be readily understood and audited and to provide Plaintiffs accurate and detailed accountings and support documents covering all aspects of Always Fresh's handling of Plaintiffs' produce, including all sales, adjustments, rejections, details of consigned or jointed shipments and sales through brokers, auctions, and status of all claims filed with or collected from carriers. *See* 7 U.S.C. § 499i; 7 C.F.R. §§ 46.14(a), 46.32(b).

119.     Always Fresh breached its duties to provide accurate and detailed accountings and supporting information to Plaintiffs, despite their requests.

120.     Always Fresh undertook a duty to deliver liquidation statements to Plaintiffs, accounting for the sales and charges against Plaintiffs' fruit, and pay Plaintiffs within 30 days after delivery of shipments to Always Fresh.

121.     Always Fresh regularly failed to deliver liquidation statements and make payments to Plaintiffs as required and was more than a month behind in its liquidation and payment obligations for much of the 2019-2020 export season.

122.     Always Fresh's liquidation reports to Plaintiffs improperly pooled or averaged sales and expenses without Plaintiffs' advance, written consent.

123.    Always Fresh was obligated to pay Giddings Mexico, but has never paid, the difference between the proceeds of Always Fresh's sales and competitive grower prices Giddings Mexico paid for the fruit it supplied to Always Fresh.

124.    As a result of Always Fresh's failure to truly and correctly account to Plaintiffs and make full payment promptly, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT V

### Fraudulent Inducement

### (Retention of Always Fresh as Sales Agent – All Defendants)

125.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 88 as though separately set forth herein.

126.    Always Fresh, through its principals Wayne and Matthew Giddings, made repeated false and misleading statements to Plaintiffs and their representatives with intent to deceive and to induce their agreement to retain Always Fresh as Plaintiffs' North American sales agent in the 2019-2020 season and pursue an ownership stake in Always Fresh.  These statements include, but are not limited to representations that:

    a.    Always Fresh possessed the skill, knowledge, expertise, and processes to handle and sell Plaintiffs' entire supply of fruit for the North American market at competitive prices;

    b.    Always Fresh was committed to and would adhere to transaction and supply chain transparency, defined operational procedures, and cost transparency;

c. Always Fresh's Famous software would provide Plaintiffs' desired level of transparency on pricing, sales, and related information;

d. Always Fresh provides its growers "[a]ccurate and timely information, constant communication;"

e. Always Fresh had created "distribution channels to maximize fresh deliveries, increasing consumption;"

f. Always Fresh excelled in "[e]xecuting logistics and supply chain;"

g. Always Fresh was a "supply chain company with activity and therefore knowledge of every step in the supply chain," that had "[i]nvest[ed] in the supply chain to enhance freshness and service;"

h. Always Fresh used a "[d]emand forecasting tool that allow (sic) for detailed weekly view by customer and commodity type;" and

i. Always Fresh's represented that based on its experience in the berry business, including the "unrivaled" experience of Wayne Giddings, Matthew Giddings, and Keith Mixon, Always Fresh had the wherewithal to handle and sell 100% of Plaintiffs' fruit at competitive prices.

127. Defendants' false statements were material to Plaintiffs' decision to work with Always Fresh and Defendants made the statements knowing they were important to Plaintiffs' decision and intending that the misrepresentations would induce Plaintiffs to act on them.

128. Defendants knew their representations were false and materially misleading in the context they were made.

129.     As to representations about future performance, Defendants had no intention that the representations would be performed or met and knew that Always Fresh's limited resources precluded Always Fresh from performing or meeting them.

130.     Plaintiffs reasonably relied on Defendants' false and misleading statements to their detriment by supplying their fruit for the North American export market to Always Fresh.

131.     Plaintiffs have suffered damages as a result of Always Fresh's fraudulent, false and misleading statements to Plaintiffs in an amount to be determined at trial.

## COUNT VI

### Fraudulent Inducement

### (Continuation of Agency Relationship – All Defendants)

132.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1-90 as though separately set forth herein.

133.     Matthew Giddings falsely promised Grupo Giddings' principal on November 27, 2019, to induce Plaintiffs' continued performance, that Always Fresh would "start absorbing the difference" between the amounts otherwise payable to Giddings Mexico and the prices Giddings Mexico paid to its farmers "to reflect competitive field prices," and promised: "I will as well keep an open line in Mexico to make sure we are higher then (sic) the field."

134.     Upon information and belief, Wayne Giddings approved the decision for Always Fresh to start absorbing the difference between the net proceeds of its sale of Giddings Mexico's fruit and the prices Giddings Mexico paid to its growers, as communicated by Matthew Giddings on November 27, 2019.

-31-

135.    Defendants had no intention that they would honor the commitment made to Giddings Mexico to absorb the difference between Always Fresh's sale prices and competitive prices Giddings Mexico paid for the fruit.

136.    Defendants' misrepresentation was material to Giddings Mexico's decision to continue working with Always Fresh and Defendants made their commitment to absorb price and cost differences knowing it was important to Giddings Mexico's decision and intending that their misrepresentation would induce Giddings Mexico to continue supplying its fruit to Always Fresh.

137.    Giddings Mexico reasonably relied to its detriment on Always Fresh's promise to absorb the difference between Always Fresh's sales prices and competitive prices Giddings Mexico paid for the fruit by continuing to supply Always Fresh with fruit for sale on its behalf even though it continued incurring such losses.

138.    Giddings Mexico has suffered damages as a result of Defendants' fraudulent, false and misleading representation in an amount to be determined at trial.

## COUNT VII

### Negligent Misrepresentation

### (All Defendants)

139.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

140.    Always Fresh, through its principals Wayne and Matthew Giddings, made repeated misrepresentations to Plaintiffs and their representatives to induce their agreement to retain Always Fresh as Plaintiffs' North American sales agent in the 2019-2020 season and

pursue an ownership stake in Always Fresh.  These misrepresentations include, but are not limited to misrepresentations that:

a.  Always Fresh possessed the skill, knowledge, expertise, and processes to handle and sell Plaintiffs' entire supply of fruit for the North American market at competitive prices;

b.  Always Fresh was committed to and would adhere to transaction and supply chain transparency, defined operational procedures, and cost transparency;

c.  Always Fresh's Famous software would provide Plaintiffs' desired level of transparency on pricing, sales, and related information;

d.  Always Fresh provides its growers "[a]ccurate and timely information, constant communication;"

e.  Always Fresh had created "distribution channels to maximize fresh deliveries, increasing consumption;"

f.  Always Fresh excelled in "[e]xecuting logistics and supply chain;"

g.  Always Fresh was a "supply chain company with activity and therefore knowledge of every step in the supply chain," that had "[i]nvest[ed] in the supply chain to enhance freshness and service;"

h.  Always Fresh used a "[d]emand forecasting tool that allow (sic) for detailed weekly view by customer and commodity type;" and

i.  Always Fresh's represented that based on its experience in the berry business, including the "unrivaled" experience of Wayne Giddings, Matthew Giddings,

-33-

and Keith Mixon, Always Fresh had the wherewithal to handle and sell 100% of Plaintiffs' fruit at competitive prices.

141.    Matthew Giddings misrepresented to Plaintiffs' principal on November 27, 2019 that Always Fresh would "start absorbing the difference" between the liquidations otherwise payable to Giddings Mexico and the prices Giddings Mexico paid to its farmers "to reflect competitive field prices," and promised: "I will as well keep an open line in Mexico to make sure we are higher then (sic) the field."

142.    Each of the misrepresentations Defendants made with respect to transparency of information and the operational and other capabilities of Always Fresh were material to Plaintiffs' decision to work with and pursue an ownership interest in Always Fresh and Defendants made the statements knowing they were important to Plaintiffs' decision.

143.    Defendants made these misrepresentations without knowledge as to their truth or falsity or under circumstances in which Defendants ought to have known of their falsity.

144.    Plaintiffs reasonably and justifiably relied on Defendants' false and misleading statements to their detriment by supplying their fruit for the North American export market to Always Fresh and forgoing opportunities to work with and gain ownership interests in other North American marketing companies, and Giddings Mexico reasonably relied on Always Fresh's promise to absorb differences between Always Fresh's prices and competitive prices to Mexican growers by continuing to supply Always Fresh with fruit for sale on its behalf even though it continued incurring such losses.

145.    Plaintiffs have suffered damages as a result of Always Fresh's negligent misrepresentations in an amount to be determined at trial.

## COUNT VIII

**(Violation of Florida Deceptive and Unfair Trade Practices Act)**

**(All Defendants)**

146.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

147.     The Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce[.]" Fla.  Stat.  § 501.204(1).

148.     Defendants each committed unfair and deceptive acts and engaged in unfair and deceptive practices with respect to their inducement of Plaintiffs to supply their fruit for the North American export market to Always Fresh and pursuit of an equity interest in Always Fresh to the detriment of other opportunities, and with respect to their handling and transactions in Plaintiffs' fruit, accountings, and payments to Plaintiffs in the course of the 2019-2020 season.

149.     Defendants each made fraudulent or negligent misrepresentations in the course of negotiating for and providing services as Plaintiffs' North American sales agent, including but not limited to misrepresentations that:

  a.  Always Fresh possessed the skill, knowledge, expertise, and processes to handle and sell Plaintiffs' entire supply of fruit for the North American market at competitive prices;

  b.  Always Fresh was committed to and would adhere to transaction and supply chain transparency, defined operational procedures, and cost transparency;

    c.   Always Fresh's Famous software would provide Plaintiffs' desired level of transparency on pricing, sales, and related information;

    d.   Always Fresh provides its growers "[a]ccurate and timely information, constant communication;"

    e.   Always Fresh had created "distribution channels to maximize fresh deliveries, increasing consumption;"

    f.   Always Fresh excelled in "[e]xecuting logistics and supply chain;"

    g.   Always Fresh was a "supply chain company with activity and therefore knowledge of every step in the supply chain," that had "[i]nvest[ed] in the supply chain to enhance freshness and service;"

    h.   Always Fresh used a "[d]emand forecasting tool that allow (sic) for detailed weekly view by customer and commodity type;" and

    i.   Always Fresh's represented that based on its experience in the berry business, including the "unrivaled" experience of Wayne Giddings, Matthew Giddings, and Keith Mixon, Always Fresh had the wherewithal to handle and sell 100% of Plaintiffs' fruit at competitive prices.

150.   Further, Matthew Giddings fraudulently or negligently misrepresented to Plaintiffs that Always Fresh would "start absorbing the difference" between the liquidations otherwise payable to Giddings Mexico and the prices Giddings Mexico paid to its farmers "to reflect competitive field prices," and promised: "I will as well keep an open line in Mexico to make sure we are higher then (sic) the field."

151.    Defendants' fraudulent or negligent misrepresentations were successful in inducing Plaintiffs to provide their fruit to Always Fresh as their North American sales agent and forgo opportunities to work with and pursue an equity interest in other firms better able to market and sell Plaintiffs' fruit for higher prices.

152.    The FDUTPA expressly prohibits violations of "[a]ny law…which proscribes…unfair, deceptive, or unconscionable acts or practices." 7 Fla.   Stat.   § 501.203(3)(c).

153.    PACA proscribes certain "[u]nfair conduct" and declares it unlawful for "any commission merchant to discard, dump, or destroy without reasonable cause, any perishable agricultural commodity received by such commission merchant in interstate or foreign commerce" and for "any commission merchant [or] dealer…to make, for a fraudulent purpose, any false or misleading statement in connection with any transaction involving any perishable agricultural commodity which is received in interstate or foreign commerce by such commission merchant, or bought or sold, or contracted to be bought, sold, or consigned, in such commerce by such dealer…or to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; or to fail, without reasonable cause, to perform any specification or duty, express or implied, arising out of any undertaking in connection with any such transaction…" 7 U.S.C.  § 499b.

154.    Always Fresh committed unfair acts and engaged in unfair practices proscribed by PACA and related regulations by making false and misleading statements, including those alleged above, for a fraudulent purpose in connection with interstate or foreign transactions

involving Plaintiffs' fruit, by discarding, dumping, or destroying Plaintiffs' fruit without reasonable cause, proper documentation, or Plaintiffs' consent, by failing to truly and correctly account to and pay Plaintiffs promptly, and by failing to fully perform Always Fresh's duties to Plaintiffs arising from their transactions.

155.    Always Fresh's unfair, deceptive, and unconscionable acts and practices caused Plaintiffs to suffer damages in an amount to be determined at trial.

<u>**COUNT IX**</u>

**Breach of Fiduciary Duty**

**(Always Fresh)**

156.    Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

157.    As a commission merchant under PACA and as the sales agent for Plaintiffs, Always Fresh owed a fiduciary duty to exercise ordinary and reasonable care, prudence, diligence and skill in the handling and sales of Plaintiffs' fruit and a duty to perform in accordance with the responsibilities of trust and confidence placed on it as a fiduciary.

158.    By placing their fruit with Always Fresh, Plaintiffs at all times relied on this fiduciary relationship and depended upon and trusted Always Fresh to perform in accordance with it, selling Plaintiffs' fruit in a fair and reasonable manner, keeping Plaintiffs' best interests foremost in its mind, and observing the law.

159.    Contrary to its fiduciary duties, however, Always Fresh violated this trust by, but not limited to, the following actions and inactions:

a. Providing false and misleading information to Plaintiffs about Always Fresh's resources, operations, practices, and capacity to sell Plaintiffs' fruit;

b. Providing false and misleading information to Plaintiffs about Always Fresh's ability and intentions to share sales, customer, and other transaction information with Plaintiffs in an open and transparent manner;

c. Providing false and misleading information to Plaintiffs about Always Fresh's sales programs with customers and forecasted pricing;

d. Concealing inventory issues and other problems in promptly selling Plaintiffs' fruit;

e. Engaging brokers, auction houses, and commission sellers to assist Always Fresh in selling Plaintiffs' fruit, and deducting their fees from Plaintiffs' sales proceeds, without first obtaining Plaintiffs' permission;

f. Unilaterally dumping fruit, reducing its sales price, making other price adjustments, and allowing customers to reject or dump Plaintiffs' fruit without first obtaining a neutral and impartial inspection (or Plaintiffs' approval) and other proof to support the price reductions or destruction of fruit;

g. Failing to timely render true and correct accountings to Plaintiffs of its dealings in Plaintiffs' fruit;

h. Failing to pay timely the proceeds from the sale of Plaintiffs' fruit; and

i. Pooling Plaintiffs' fruit with the fruit of other growers and/or pooling expenses contrary to Always Fresh's legal and contractual obligations.

160.   Plaintiffs have suffered damages as a result of Always Fresh's wrongful acts and omissions in an amount to be determined at trial.

## COUNT X

### Negligence

### (Always Fresh)

161.   Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

162.   Always Fresh holds itself out, and at all material times held itself out, as a skilled, experienced, and highly qualified (i.e.  professional) commission merchant of fresh fruit  in the United States and Canada.

163.   As such, Always Fresh had the duty to serve Plaintiffs in accordance with the standard of care used by other commission merchants selling fresh fruit in international commerce.  That duty included, but was not limited to, the obligation to use all reasonable efforts to sell Plaintiffs' fruit at or above market prices or agreed-upon competitive benchmark prices, and the obligation to promptly account for and remit the proceeds of those sales to Plaintiffs with only proper deductions.

164.   Always Fresh breached its duty to Plaintiffs by failing to properly preserve, handle, sell, account for, and promptly remit the proceeds from the sale of Plaintiffs' fruit with the skill, prudence, and diligence commonly exercised by commission merchants of fresh fruit when marketing a supplier's fresh fruit.

165.   As a direct and proximate result of Always Fresh's negligence, Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT XI

### Breach of Contract

### (Always Fresh)

166.     Plaintiffs reassert and incorporate by reference the allegations contained in Paragraphs 1- 90 as though separately set forth herein.

167.     Plaintiffs and Always Fresh formed a valid contract through oral and written communications and their course of dealing as to the following terms:

a. Always Fresh would accept and sell for Plaintiffs on consignment their entire production of fruit for the North American export market in the 2019-2020 season;

b. The parties would communicate openly and transparently about supply-side and sales-side information, including, as to Always Fresh: providing accurate pricing forecasts, providing sound advice as to pack sizes and other logistics, providing accurate and timely information about customers, sales, and inventories, and communicating any issues encountered with respect to its performance;

c. Always Fresh would deduct an 8% commission and only its normal expenses directly related to handling Plaintiffs' fruit from the gross prices it earned from its sales;

d. Always Fresh would provide liquidation statements to Plaintiffs and make payment to Plaintiffs within 30 days after fruit was delivered to Always Fresh; and

EAST\177764640.1

e. Always Fresh would compensate Giddings Mexico, beginning November 27, 2019, for the difference between the net sales proceeds from Always Fresh's sales of Giddings Mexico's fruit and the amounts Giddings Mexico paid to its suppliers of fruit.

168. Always Fresh breached the parties' contract by, among other things:

a. Providing false and misleading information to Plaintiffs about Always Fresh's sales programs with customers and forecasted pricing;

b. Failing and refusing to provide Plaintiffs with accurate and timely information about customers, sales, rejections, inventories, and other detail of Always Fresh's handling of Plaintiffs' fruit;

c. Failing to timely render true and correct accountings to Plaintiffs of its dealings in Plaintiffs' fruit;

d. Failing to pay timely the proceeds from the sale of Plaintiffs' fruit; and

e. Failing and refusing to pay Giddings Mexico the difference between the net sales proceeds from Always Fresh's sales of Giddings Mexico's fruit and the amounts Giddings Mexico paid to its suppliers of fruit beginning November 27, 2019.

169. Plaintiffs have suffered damages as a result of Always Fresh's wrongful acts and omissions in an amount to be determined at trial.

**WHEREFORE**, Plaintiffs respectfully request judgment against Always Fresh as follows:

A. For consequential damages in an amount to be proven at trial;

B.      For an amount equal to all commissions paid by Plaintiffs to Always Fresh (or deducted from Plaintiffs' sales proceeds) in an amount to be proven at trial;

C.      For punitive damages in an amount to be proven at trial;

D.      For an award of Plaintiffs' attorneys' fees and costs;

E.      For pre and post-judgment interest at the Florida statutory rate until paid in full; and

F.      For such other and further relief as the Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiffs demand a jury trial on all issues so triable.

Dated: December 4, 2020          Respectfully submitted,

**DLA PIPER LLP (US)**

/s/ *Ardith Bronson*_____
Ardith Bronson, Esq.
Florida Bar No.  423025
ardith.bronson@dlapiper.com
Trial Counsel
200 South Biscayne Blvd., Suite 2500
Miami, Florida 33131
Tel.: (305) 423-8562
Fax: (305) 675-6366

-and-

Mary E. Gately, Esq. (*Pro Hac Vice* forth coming)
mary.gately@dlapiper.com
500 Eighth Street, NW
Washington, DC 20004
Tel.: (202) 799-4507
Fax: (703) 772-0191

-43-

-and-

Craig M. Waugh, Esq. (*Pro Hac Vice* forth coming)
craig.waugh@dlapiper.com
2525 East Camelback Road
Esplanade II Suite 1000
Phoenix, Arizona 85016
Tel.: (408) 606-5420
Fax: (480) 323-2475

*Counsel for Plaintiffs*

EAST\177764640.1